UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MTR CAPITAL, LLC,** | **17-CV-13552-TGB** |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **LAVIDA MASSAGE FRANCHISE DEVELOPMENT, INC. et al.,** | |
| Defendants. | |

Joaquin Esquivia, an engineer from Colombia, aspired to open a business in the United States. Through his company, Plaintiff MTR Capital ("MTR"), Esquivia and his wife invested in a franchise opportunity with Defendant LaVida Massage Franchise Development, Inc. ("LaVida"). After the venture failed, MTR brought this lawsuit against LaVida, its President Peggy Davis, and its Area Developer Duane Goodwin, claiming that they induced MTR to invest in a LaVida spa franchise by making false statements and fraudulent omissions. The parties were unable to settle their dispute and opted instead for a bench trial, which was held before the Court over four days between January 27-31, 2020.

After the evidence closed, the parties requested the opportunity to submit proposed findings of fact and conclusions of law. After carefully considering all of the testimony and documentary evidence presented at trial, as well as the detailed post-trial submissions and exhibits filed by both parties, and the governing law in the area, the Court concludes that the preponderance of evidence supports Plaintiff's claim of a violation of the Florida Deceptive and Unfair Trade Practices Act, and Plaintiff is entitled to damages in the amount of the initial $39,000 franchise fee. As to all other claims, Plaintiff failed to meet its burden, and judgment must be entered in favor of Defendants.

## INTRODUCTION

LaVida Massage Franchise Development, Inc. is a franchisor located in Brighton, Michigan. Defendant Peggy Davis is LaVida's President. Defendant Duane Goodwin is LaVida's Area Developer for the southeast United States.

On February 17, 2015, Plaintiff MTR Capital Inc., through its owner Joaquin Esquivia, entered into a Franchise Agreement with LaVida for the operation of a "LaVida Massage" center to be located in Kendall, Florida. Joint Final Pretrial Order, ECF No. 70, PageID.1123. Plaintiff alleges his decision to invest approximately $450,000 into his LaVida franchise was based on misrepresentations made by the Defendants and that he was

2

eventually forced to shutter the business due to poor performance after only a year and a half. *Id.* Plaintiff seeks to recoup his entire investment, which amounts to $541,644.82 after operating costs and salaries. *Id.* at PageID.1121.

Plaintiff brings claims for (1) fraudulent inducement and misrepresentation; (2) negligent misrepresentation; (3) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §501.203(3); and (4) violations of the Florida Franchise Act ("FFA"), Fla. Stat. § 817.416.[1] Compl., ECF No. 1, PageID.17-22.

The crux of Plaintiff's case turns on three misrepresentations allegedly made by Defendants before Plaintiff signed the franchise agreement. Specifically, Plaintiff alleges that Defendants misrepresented (1) the facts concerning the unit-level economics of LaVida franchises; (2) the amount of the initial investment required to start a LaVida franchise; and (3) the full story of how existing LaVida franchises were performing. Joint Final Pretrial Order, ECF No. 70, PageID.1123.

At trial, Plaintiff presented Esquivia, Davis, Goodwin and franchise law attorney Keith Kanouse as witnesses. Esquivia testified regarding the timeline of events in developing the venture,

---

[1] The parties stipulated to dismissal of their cross-breach of contract claims. ECF No. 71.

the content and nature of his communications with Defendants throughout the process, and the reasons he believes the business eventually closed. Tr. 1/274/20, ECF No. 72, PageID.1204-58. Defendant Davis testified to the way that LaVida worked with franchisees and the nature of the information and guidance it supplied them, as well as to the success rates of LaVida franchises on the whole. Tr. 1/28/20, ECF No. 73, PageID.1383-1490; Tr. 1/29/20, ECF No. 74, PageID.1534-39. Defendant Goodwin testified to the financial management training that he generally gives to franchisees, to his performance and experiences as a LaVida franchisee himself, and to specific conversations he had with Esquivia and his partners regarding financial planning, marketing, and management. Tr. 1/29/20, ECF No. 74, PageID.1534-1628. Kanouse testified regarding the presale disclosures required of franchisors, the required disclosures when a franchisee is terminated or their business fails, and customs and practices within the franchise industry. Tr. 1/29/20, ECF No. 74, PageID.1628-79.

Defendants contend that LaVida did not make any material misrepresentations or material omissions to Plaintiff regarding startup costs or the performance of existing LaVida franchises before Plaintiff signed the franchise agreement. Joint Final Pretrial Order, ECF No. 70, PageID.1130. Defendants further argue that

they did not intend to make any future performance projections to Plaintiff, and that any losses Plaintiff's franchise suffered were caused by Plaintiff's poor management and excessive building costs—and not the actions of the Defendants. *Id.* Benjamin Pryor and Mark Davis testified for the Defendants. Pryor is Director of Operations for LaVida and testified to his interactions with Plaintiff's representatives during the start-up period of their franchise and how their performance compared to that of other LaVida franchisees. Tr. 1/29/20, ECF No. 74, PageID.1680-1702. Mark Davis, CEO of LaVida, testified as to how he builds relationships with and supports new franchisees, as well as his experience working with Plaintiff and the new franchise. Tr. 1/30/20, ECF No. 75, PageID.1709-52.

## FINDINGS OF FACT

In August 2014, Joaquin Esquivia, who was living in Colombia and pursuing an E-2 visa in the United States, contacted a U.S.-based franchise broker named Bernardo Yibirin to obtain information regarding franchise opportunities in the United States. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1210-12. Yibirin presented Esquivia with a variety of options. Of those, Esquivia eventually focused on the opportunity presented by a LaVida franchise. Joint Final Pretrial Order, ECF No. 70, PageID.1135; Test. of Joaquin Esquivia, Tr.1/27/20, ECF No. 72,

5

PageID.1210-12. Esquivia was interested in using his investment in the LaVida franchise to satisfy the E-2 visa's investment condition. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1301-02. Esquivia enlisted his childhood friend and business associate Reynaldo Cordoba to help him start up and eventually run the franchise. Cordoba Dep. 74:2-3, ECF No. 65-1, PageID.831.

On October 13, 2014, a conference call was held with Esquivia, Cordoba, Yibirin, and Defendant Duane Goodwin. *Id.* at 75:12-14, PageID.831. During the phone call, the parties discussed the LaVida franchise business, but Goodwin stated that he could not make any specific earnings claims. Of the conversation, Yibirin testified: "Goodwin. He was very-very professional, very quiet and not talking about numbers. I asked him, 'Can you give him more information?' 'I'm sorry; I cannot provide. They have to sign the FDD, talk with other franchisees, and they can provide the information.'" Yibirin Dep. 92:9-14, ECF No. 69, PageID.1102. When asked more specifically "[i]f Duane made any earnings claims about LaVida Massage franchise during this conference call," Yibirin responded, "Never." *Id.* at 50:10-13, PageID.1092.

On October 14, 2014, Goodwin sent Cordoba, Esquivia and Yibirin an email with an attached Excel spreadsheet, which he stated was "a helpful tool to understand cost and volume impacts

6

on the business as you collect your various data points to evaluate the franchise opportunity." Pl.'s Ex. C, ECF No. 1, PageID.73; Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1542-51, 1564-66. The spreadsheet contained "model" income and expense figures and could be used to project revenue based on data entered into the form. Cordoba employed the tool by inputting numbers into the spreadsheet to assess different scenarios. Test. of Joaquin Esquivia, Tr. 1/28/20, ECF No. 73, PageID.1347-49.

Also on October 14, 2014, LaVida sent Esquivia and Cordoba franchise documents to review, including LaVida's 2014 "Franchise Disclosure Document" ("FDD"). Defs.' Ex. 1, ECF No. 62-1, PageID.783. The FDD represented that the estimated initial investment costs to start a LaVida franchise were $160,250 to $290,000. *Id.* The FDD did not include any financial performance data in "Item 19," which is where any financial projections made by a franchisor to a franchisee must be made. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1388-90. Defendants chose not to make a disclosure in Item 19 because certain LaVida franchisees were not performing well, and Defendants believed that disclosing the performance of the handful of struggling franchisees would reflect poorly on the LaVida brand. *Id.* Defendants also failed to disclose in Item 20 of the FDD that certain franchise locations had

ceased operations in 2014, including one in Royal Palm, Florida. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1417.

MTR electronically acknowledged receipt of the FDD on October 20, 2014. Joint Final Pretrial Order, ECF No. 70, PageID.1137. Esquivia testified that he read the FDD. Tr. 1/27/20, ECF No. 72, PageIDs.1230, 1236, 1240. Cordoba took only a superficial look at the FDD. Cordoba Dep. 83:16-19, ECF No. 65-1, PageID.833. Cordoba does not recall anything in particular that stood out in the FDD. *Id.* at 84:1-3, PageID.833. No one from LaVida represented to Cordoba that the FDD was a simple standard form document. *Id.* at 172:3-7, PageID.855. Cordoba felt the FDD was a legal document that should be reviewed by an attorney. *Id.* at 172:20-173:2, PageID.855. Esquivia did not hire an attorney to review the FDD. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1240.

At some point before making the decision to invest, Esquivia reviewed LaVida's website, as well as a press release sent to him by email, both of which touted LaVida's growth in the southeast region. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1217; Pl.'s Ex. 45, ECF No. 64-1, Page.ID.797. As relevant here, the website described how LaVida's Brighton, Michigan center was supporting itself "[w]ithin a few short weeks" and "within a few months it was making a profit." Pl.'s Ex. 264, ECF

8

No. 64-1, PageID.808. The press release described how LaVida enjoyed growth of more than thirty-five percent (35%) in 2014 alone, how annual revenue had increased by one hundred forty-eight percent (148%), membership sales across the network tripled, and new clients had increased by one hundred fifteen percent (115%). Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1218; Pl.'s Exs. 45, 49, ECF No. 64-1, PageID.797. At trial, Defendants were unable to substantiate any of the figures above and admitted that the press release was "poorly written." Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1468-77.

Cordoba meanwhile performed an investigation of LaVida's operations, including marketing, rent, franchise costs, market demographics in the Miami area, and city and county zoning requirements. Cordoba Dep. 79:18-94:19, ECF No. 65-1, PageID.832-36. Cordoba also attended a "Discovery Day" on December 16, 2014 at LaVida's headquarters in Commerce, Michigan to learn more about LaVida franchise operations. Joint Final Pretrial Order, ECF No. 70, PageID.1137. Esquivia and his wife, Christien Acosta, did not attend. Cordoba Dep. 84:25-85:2, ECF No. 65-1, PageID.833. Mark Davis and Evan Kaltschmidt, then LaVida's Chief Operating Officer, spent Discovery Day with Cordoba. Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1715. Discovery Day included visits to two LaVida Massage

Centers. Cordoba Dep. 121:17-22, 122:13-25, ECF No. 65-1, PageID.842-43. These are the only franchise visits that were ever made by Cordoba. *Id.* at 123:13-15, PageID.843. Cordoba did not call any other LaVida massage franchise owners as part of his diligence investigation. *Id.* at 123:16-18, PageID.843. Esquivia and Acosta themselves never contacted a LaVida Massage Center prior to signing the Franchise Agreement. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1270.

Based on what Cordoba learned, he modeled a range of financial scenarios: some good and some bad. Cordoba Dep. 138:23-139:2, ECF No. 65-1, PageID.847. The scenarios were based on a modified version of the interactive spreadsheet emailed to him by Goodwin on October 14, 2014. *Id.* at 136:11-16, PageID.846. Cordoba sent the scenarios to Esquivia and Yibirin for their review. *Id.* at 136:23-137:2, PageID.846. On January 7, 2015, Yibirin sent an email to Goodwin attaching the scenarios. He asked Goodwin: "What do you think? Are they realistic? Any comment will be appreciated.!!!" *Id.* at 136:11-16, PageID.937. On January 10, 2015, Goodwin responded to Yibirin's email, stating: "Due to legal restrictions we cannot give specific answers as that would be a representation. What I will advise is that a more conservative approach should be used for financial planning." Defs.' Exhibit 29, ECF No. 62-1, PageID.784. The email continued: "My advice is to

plan for the worse case (time to achieve and volume levels per day) for financial purposes and have a more aggressive operating plan." *Id.*; Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1568-70. Goodwin believed that some of the inputs Cordoba had entered into the spreadsheet were extremely high and unrealistic, such as the ability to perform 120 massages per day. Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1566-67.

LaVida presented MTR with a draft Franchise Agreement on January 28, 2015. This was the contract Esquivia would have to sign in order to open a LaVida center. Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1570. Esquivia read the Franchise Agreement, though he admitted at trial that he did not read it "carefully enough to understand it." Tr. 1/28/20, ECF No. 73, PageID.1376. On February 2, 2015, Esquivia sent an email to Yibirin, copying Acosta and Cordoba, asking 18 questions about the Franchise Agreement. Defs.' Ex. 31, ECF No. 62-1, PageID.784. Yibirin forwarded the questions in an email to Goodwin on February 4. Defs.' Ex. 32, ECF No. 62-1, PageID.785.

Among the questions presented by Esquivia was question 16, which stated: "There is no clause addressing that if I follow all procedures and policies of the system I will be profitable." Defs.' Ex. 31, ECF No. 62-1, PageID.784. On February 5, 2015, Peggy Davis, LaVida's President, sent an email in response to Esquivia's

11

questions. The email stated that she had "answered most of [Esquivia's] questions in the attached revised franchise agreement" and "I understand your need for a promise of profitability but I can't make that promise as everyone's ideas of 'following protocols and procedures' are different and very subjective. Obviously, it takes more than just following procedure to make a business successful. Without a good amount of common sense, hard work, and determination any business model would surely fail." Defs.' Ex. 33, ECF No. 62-1, PageID.785. Esquivia read that email from Davis. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1309.

Revised drafts of the Franchise Agreement were then exchanged (Defs.' Exs. 34 and 35, ECF No. 62-1, PageID.785) and Esquivia signed the final version on February 17, 2015. Defs.' Ex. 2, ECF No. 65-2, PageID.862. The initial franchising fee was $39,000. Pl.'s Ex. A, ECF No. 1-1, PageID.29. The Franchise Agreement has Esquivia's initials on every page. *Id.* at PageID.25-63. Esquivia did not write anything in the space provided for describing financial representations. *Id.* at PageID.61.

Esquivia did not consult an accountant or attorney, other than immigration counsel, in connection with his due diligence. Joint Final Pretrial Order, ECF No. 70, PageID.1139. Esquivia did not contact or visit any existing franchisees. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1270.

Following execution of the Franchise Agreement, LaVida helped the MTR team investigate and design suitable space to lease for their center. Defs.' Exs. 36, 37, 38, 41, 42, ECF No. 62-1, PageID.785; Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1310-14; Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1570-73. MTR then selected a location in Kendall, Florida. Defs.' Exs. 52, ECF No. 62-1, PageID.786; Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1315. The location was in the Crosswinds Shopping Center, adjacent to the anchor tenant, Publix Supermarket. Joint Final Pretrial Order, ECF No. 70, PageID.1139. Cordoba was then in charge of overseeing construction because Esquivia remained in Colombia. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1316.

From October 5-9, 2015, LaVida offered its mandatory five-day management training session to MTR. Cordoba and Acosta attended management training. Cordoba Dep. 127:23-25, ECF No. 65-1, PageID.844; Acosta Dep. 30:13-21, ECF No. 86-1, PageID.2016. Esquivia was still in Colombia and did not attend. Acosta Dep. 30:22-31:1, ECF No. 86-1, PageID.2016. Following the training, certain reference materials were supplied by LaVida and were available online for MTR's use. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1276-91; Defs.' Exs. 3-24, ECF No. 62-1, PageID.783-84. For example, Defendants' Exhibit 5 is the LaVida

13

Massage 117-page Operations Manual, available to all franchisees via the LaVida intranet. LaVida also provided pre-opening marketing assistance. Test. of Duane Goodwin, Tr. 1/29/20, ECF No. 74, PageID.1576-82.

After construction costs for MTR's Kendall franchise exceeded Esquivia's initial projection by approximately $60,000, Esquivia and Cordoba had a falling out and Cordoba left the project. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1317-25. The schism erupted when Esquivia asked Cordoba to contribute funds and Cordoba refused because he believed the agreement between them was that he would be a partner without investing capital. *Id.*; Cordoba Dep. 64:2-10, ECF No. 65-1, PageID.828.

With Cordoba gone, Acosta took charge of the Kendall franchise opening. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1332-33. From February 29, 2016 to March 4, 2016, the week before the franchise opened, Davis conducted on-site training to assist Acosta before the opening. Joint Final Pretrial Order, ECF No. 70, PageID.1139; Acosta Dep. 53:22-25, 54:21-23, ECF No. 86-1, PageID.2021-22; Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1726-27. Davis grew concerned about MTR's marketing and management. Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1727-30.

On May 25, 2016, Esquivia asked Defendants for help with marketing. Defs.' Ex. 68, ECF No. 62-1, PageID.787. His email contained a chart of MTR's marketing efforts. Goodwin responded via email and a telephone meeting was scheduled and held the following week. Goodwin summarized the phone meeting by adding comments to the chart contained in Esquivia's May 25 email and adding his own marketing suggestions. Defs.' Ex. 69, ECF No. 62-1, PageID.787. In his cover email to MTR, Goodwin stated, "I hope that the attached will help guide you towards more effective advertising programs. I wish there was a single silver bullet that works for all locations, but after doing this for 40+ years it has been my experience that local hard work is the only solution." *Id.* Goodwin continued: "We are here to help and have been in the same situation as you are. With hard work and effective/reactive planning, the business will grow." *Id.*

In addition to its problems with advertising, MTR experienced significant managerial and customer relations difficulties upon opening. For example, MTR went through four lead sales associates during its short period of operation and never had a facility operations manager. Acosta Dep. 39:24-42:14, ECF No. 86-1, PageID.2018-19. By April 2017, approximately one year after opening, Acosta had grown unhappy managing the franchise and decided to take another job. Acosta Dep. 62:14-16, ECF No. 86-1,

PageID.2024. While it was open, MTR's LaVida franchise generally received poor reviews from clients and for some time ranked in the bottom 10% of LaVida franchises in customer satisfaction. Test. of Benjamin Pryor, Tr. 1/29/20, ECF No. 74, PageID.1687. Defendants identified issues with MTR's marketing, staff management, customer service, and operations, and provided suggestions to MTR to address those issues. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1364-65; Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1735. LaVida's suggestions were either not adopted, poorly implemented, or insufficient to remedy the MTR franchise's deficiencies. *See* Test. of Joaquin Esquivia, Tr. 1/28/20, ECF No. 73, PageID.1364-65; Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1735.

MTR's franchise closed in late September 2017. Joint Final Pretrial Order, ECF No. 70, PageID.1140. This lawsuit followed.

## CONCLUSIONS OF LAW

As a preliminary matter, this Court must address a choice-of-law question regarding whether to apply Michigan or Florida law to the tort claims in this case. A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Michigan's choice-of-law rules concerning tort claims, there is a presumption that Michigan law applies unless

16

there is a rational reason to displace it. *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013). To determine whether there is a rational reason, the Court first asks if there is a foreign state that would have an interest in the matter, and then determines if Michigan's interests mandate that its law nevertheless be applied. *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 961 (E.D. Mich. 2017) (citing *Sutherland v. Kennington Truck Serv.*, Ltd., 562 N.W.2d 466, 471 (1997)).

Here, Plaintiff is based in Florida, and many of the representations and communications at issue occurred in Florida, giving that state an interest in the matter. Neither party has challenged the application of Florida law at any point in this case, and the parties' joint statement of claims (ECF No. 61) exclusively cites to Florida law. Given these circumstances, the Court finds that Michigan's interest in applying its own law is minimal and the interest in applying Florida law prevails.

## I.   Claim One: Fraud/Fraudulent Inducement and Misrepresentation

The elements of a claim for fraudulent inducement under Florida law are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and

(4) consequent injury by the party acting in reliance on the representation."[2] *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

Plaintiff contends that Defendants knowingly overstated the prospects for success of a LaVida franchise, overstated their regional expansion and growth figures, and understated the amount needed for an initial investment. Pl.'s Proposed Findings of Fact, ECF No. 83, PageID.1940-41. Defendants contend that no misrepresentations were made, and even if misrepresentations were made, they were made before the signing of the Franchise Agreement and were explicitly disclaimed in the Franchise Agreement's integration and disclaimer clauses. Defs.' Post-Trial Br., ECF No. 80, PageID.1870. The Court will discuss each of the statements that Plaintiff claims satisfy the elements of fraudulent inducement and misrepresentation.

### a. Website and press release statements

A false statement of fact must "concern a past or existing fact in order to be actionable." *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172 (Fla. Dist. Ct. App. 1994). Any "puffing" statements cannot meet this standard, and it is the responsibility of the buyer to investigate these kinds of statements that are not

---

[2] The Court notes that the Joint Statement of Claims states these elements slightly differently. ECF No. 61, PageID.763-64. There is no material difference in the overall elements of the tort, however, and the Court therefore relies on the phrasing articulated by the Florida Supreme Court.

clearly based in fact. *MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561 (Fla. Dist. Ct. App. 2017.) Therefore, a misrepresentation is also not actionable "where its truth might have been discovered by the exercise of ordinary diligence." *Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. Dist. Ct. App. 1995).

Here, Plaintiff claims that LaVida's statements on its website and in a press release on the website contained actionable misrepresentations. The LaVida website stated that LaVida was "the #1 Concept in Health & Wellness Franchising," described the business model as "foolproof," and referenced the sales and performance outcomes of the first LaVida location in Brighton, Michigan. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1172. The touting of the company as "#1" or the business model as "foolproof" is the kind of puffery that has been found inactionable as fraud. *See, e.g., MDVIP*, 222 So. 2d at 561 ("A promise to deliver an "exceptional" product or service is a matter of opinion rather than fact . . . and constitutes non-actionable puffery."). At best, it is a close call—at which point Plaintiff had a duty to further investigate the statements and learn what was meant by "#1" and "foolproof" rather than take those words at face value. As to the statistics cited concerning the performance of the Brighton center, no evidence was presented that the statements regarding the Brighton location were false.

Likewise, with respect to the LaVida press releases touting growth in the southeast region, though Defendants were unable to provide concrete documentation or methodology to support some of the specific numbers cited in the press release, Plaintiff conversely failed to demonstrate that the figures were unequivocally false. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1467-90. None of the website or press release statements can therefore support a claim for fraud.

### b. 2014 Franchise Disclosure Document statements

Plaintiff claimed that the information in Item 20 of the 2014 FDD was inaccurate regarding the number of franchises that had opened and closed. The testimony and other evidence presented at trial proved this claim by a preponderance. *See infra* Part III.b; Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1447. For example, five franchises closed between January and April 2014, and these closures were not reflected in the 2014 FDD that was dated July 22, 2014 and provided to Plaintiff in October 2014. Test. of Peggy Davis, Tr. 1/29/20, ECF No. 74, PageID.1534-39.

But the evidence also showed that such inaccuracies occurred primarily due to LaVida's poor recordkeeping. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1387-1447. The evidence was not sufficient to show that LaVida intended to make such a false statement or intended for Plaintiff to rely on it. *Id.* The evidence is

therefore insufficient to satisfy the second and third elements of a fraudulent misrepresentation claim with regard to the 2014 FDD. *Butler*, 44 So. 3d at 105.

### c. Performance projections

Finally, Plaintiff asserts that MTR relied on inaccurate performance projections made by Defendants, including the "model spreadsheet," when making the decision to purchase a LaVida franchise. In considering Plaintiff's position, the Court must take account of the Franchise Agreement's integration clause and several of its disclaimers. Section XXIV of the Franchise Agreement is titled "NO PROJECTIONS OR REPRESENTATIONS." The section states:

> You acknowledge and represent that you have not received from us any projections or representations regarding the amount of income it can expect to earn from the franchise granted hereby. You acknowledge that no representations or warranties inconsistent with the Offering Circular or this Agreement were made to induce you to execute this Agreement.
>
> You acknowledge that neither us nor any person can guarantee the success of your business.
>
> You are entering into this Agreement after having made an independent investigation of our operations. You understand that the business venture contemplated by you under this Agreement involves a high degree of financial risk and depends to a large extent upon your abilities.
>
> The undersigned Franchisee, by signing this Franchise Agreement, acknowledges that he or she has read same and that he or she has been requested to state

> in writing hereafter any terms, claims, covenants, promises or representations, including representations as to any income or gross revenue projections that were made to him or her by Franchisor.
>
> If no such representations, etc., were made, the undersigned should write the word 'none' on the following lines:

Pl.'s Ex. A, ECF No. 1-1, PageID.61.

The precedent developed by the Florida courts is less than uniform concerning the legal effect of integration and disclaimer clauses on common law fraud claims. *See Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1315 (M.D. Fla. 2017) ("there seems to be disagreement amongst Florida courts on the issue of whether a non-reliance clause negates a claim for fraud"); *Billington v. Ginn-La Pine Island, Ltd., LLLP*, 192 So. 3d 77, 80 (Fla. Ct. App. 2016) (collecting cases and describing split among Florida state courts on the issue). Some Florida courts have held that integration and disclaimer clauses bar fraud claims as a matter of law, some have held the opposite, and the Eleventh Circuit, applying Florida law, recently struck a middle ground. This Court finds the last approach most persuasive. In *Global Quest, LLC v. Horizon Yachts, Inc.*, the Eleventh Circuit held that disclaimer clauses "may constitute evidence against plaintiff's fraud allegations, but plaintiff's [fraud] claims are not precluded as a matter of law." 849 F.3d 1022, 1028 (11th Cir. 2017). Specifically, "an integration clause [may

constitute] evidence[] that neither party has relied upon the representation of the other party made prior to the execution of the contract." *Id.* (quoting *Beeper Vibes, Inc v. Simon Property Grp., Inc.*, 600 Fed. App'x 314, 318-19 (6th Cir. 2014) (also applying Florida law)).

Here, Plaintiff read the Franchise Agreement and initialed below the integration and disclaimer clause. Test. of Joaquin Davis, ECF No. 72, PageID.1271; Pl.'s Ex. A, ECF No. 1-1. Plaintiff did not write anything in the space where he was required to list "any terms, claims, covenants, promises or representations, including representations as to any income or gross revenue projections that were made to him or her by Franchisor." Pl.'s Ex. A, ECF No. 1-1, PageID.61. There is thus "some evidence" of a lack of any reliance on prior representations afforded by the integration clause.

Plaintiff asks the Court to give less weight to the integration clause because he did not consult an attorney before signing the Franchise Agreement (other than an immigration attorney) and admitted at trial that he did not read the Franchise Agreement closely. Test. of Joaquin Davis, Tr. 1/28/20, ECF No. 73, PageID.1376. But "[t]he law necessarily presumes that parties to a contract have read and understood its contents" and that they have "respect[ed] the gravity inherent in the contracting process and carefully review[ed] a contract to ensure that material

23

representations are expressed in the instrument." *Billington*, 192 So. 3d at 84. Here, Plaintiff admittedly did no such thing and seeks to avoid the consequences of his inattention to detail.

Plaintiff's failure to read and understand the significance of the integration and disclaimer clause in the Franchise Agreement must be seen against a backdrop of explicit warnings from Defendants that they could not guarantee Plaintiff's franchise would be profitable. Specifically, in response to a question from Plaintiff about why there was no guarantee in the Franchise Agreement that he would be profitable if he followed LaVida's procedures, Davis told Plaintiff that she "underst[oo]d [Plaintiff's] need for a promise of profitability but I can't make that promise as everyone's ideas of 'following protocols and procedures' are different and very subjective. Obviously, it takes more than just following procedure to make a business successful. Without a good amount of common sense, hard work, and determination any business model would surely fail." Defs.' Ex. 33, ECF No. 62-1, PageID.785. In light of these facts, Plaintiff's claims that he relied on Defendants' future performance projections and considered them material in his decision to invest in a LaVida franchise must be weighed against Plaintiff's failure to mention the performance projections he was relying on both in the Franchise Agreement or in response to the email from Davis sent directly to Plaintiff. If Plaintiff considered

such representations material, he could have and should have listed them or responded to Davis by informing her that he was relying on them. That he did not do so allows an inference of a lack of reliance.

Considering this record, the evidence shows that MTR failed to meet its burden in proving reliance by a preponderance of the evidence. The Court cannot excuse Plaintiff from its responsibility to prove this element of a fraudulent inducement claim simply because Mr. Esquivia did not to seek the assistance of a business attorney or because he neglected to read carefully the contract he was signing. *See Saunders Leasing System, Inc. v. Gulf Central Distribution Ctr., Inc.*, 513 So. 2d 1303 (Fla. Ct. App. 1987) (holding that plaintiff would have listed representations in contract if they were material and relied upon). Consequently, the Court finds that Plaintiff failed to prove his fraudulent inducement claim.

## II.   <u>Claim Two: Negligent Misrepresentation</u>

The elements of negligent misrepresentation are: "(1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation,

resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So. 3d 502, 505 (Fla. Ct. App. 2017).

The elements of negligent misrepresentation require justifiable reliance, as opposed to merely reliance. *Id.* As discussed above, Plaintiff has failed to prove the elements of a fraudulent inducement claim. Because Plaintiff has failed to meet the lower burden of proving reliance under a fraudulent inducement claim, Plaintiff cannot meet the higher burden of showing that he *justifiably* relied on misrepresentations made by Defendants. Consequently, Plaintiff also fails to prove his negligent misrepresentation claim by a preponderance of the evidence.

### III.   Claim Three: Violations of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1). The FDUTPA goes on to specifically provide that "[i]t is the intent of the Legislature that . . . great weight shall be given to the interpretations of the Federal Trade Commission" and that violations of the FTC Act, 15 U.S.C. § 41 *et seq*., will constitute violations of the FDUTPA. Fla. Stat. §§ 501.203(3)(a), 204(2). A claim under the FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages. *Siever v.*

*BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009). Unlike a claim under the FFA, a plaintiff bringing a claim under the FDUTPA does not need to prove actual reliance on the alleged conduct. *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (unpublished). Instead, "the plaintiff must prove that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstance."" *Id.* (citing *State, Office of the Att'y Gen. v. Commerce Comm. Leasing, LLC*, 946 So.2d 1253, 1258 (Fla. 1st DCA 2007)).

Plaintiff contends that Defendants violated the FDUTPA by committing deceptive and unfair trade practices in violation of an FTC regulation, 16 C.F.R. § 436, which governs franchising disclosure requirements and prohibitions. Specifically, Plaintiff points to three separate acts that it alleges violate four sections of 16 C.F.R. § 436: § 436.9(c), § 436.5(g), § 436.5(t), and § 436.7(b). The Court finds that Plaintiff successfully alleges a violation of 16 C.F.R. § 436.7(b).

### a. Financial performance representations

First, Plaintiff cites 16 C.F.R. § 436.9(c), which states that it is a violation of the FTC Act (and therefore a violation of the FDUTPA) for a franchise seller to "[d]isseminate any financial performance representations to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the

representation at the time the representation is made, and the representation is included in Item 19 (§ 436.5(s)) of the franchisor's disclosure document." Plaintiff claims that Defendants violated this regulation when they made financial performance representations to Plaintiff 1) in the "model" financial spreadsheet, 2) at the December 2014 Discovery Day meeting, 3) during an October 14, 2014 videoconference, 4) on the LaVida website, and 5) in the text of the LaVida press releases. Pl.'s Proposed Findings of Fact, ECF No. 83, PageID.1933.

Here, with respect to the alleged 16 C.F.R. § 436.9(c) violations, as discussed above, the Franchise Agreement contained an integration and disclaimer clause that explicitly disclaimed any financial performance representations made outside of the FDD (which did not make any such representations). Defs.' Ex. 2 at 37, ECF No. 62-1, PageID.785. Again, Plaintiff signed the Franchise Agreement without closely reading it or reviewing it with an attorney. An objectively reasonable franchisee would have reviewed the document with counsel and would not have relied on any financial performance representations made by Defendants before signing the Franchise Agreement, because a reasonable franchisee would have recognized that such representations were explicitly disclaimed in the Franchise Agreement. Plaintiff's conduct was not that of a reasonable franchisee. Further, after Plaintiff asked why

28

the Franchise Agreement did not contain a guarantee of profitability, Defendants clearly informed Plaintiff in an email that they could not guarantee that Plaintiff's business would be successful. Defs.' Ex. 33, ECF No. 62-1, PageID.785. In light of such direct statements of disclaimer, a reasonable franchisee would have recognized that Defendants were not providing a guarantee that the endeavor would be financially successful, and an objectively reasonable franchisee would have known to thoroughly investigate the risks of his or her investment beforehand.

To that end, Plaintiff was encouraged to perform his own due diligence on the LaVida franchises by Defendants. Plaintiff was given the contact information for LaVida franchisees so that he could contact them. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1270. Plaintiff left the task up to Cordoba, who performed a minimal investigation and failed to call a single franchisee. Here again, Plaintiff did not perform in the manner of a reasonable franchisee. A reasonable franchisee would have performed a thorough investigation, which would have included contacting numerous franchisees and discussing their businesses with them. A reasonable franchisee would not have relied on or been misled solely by any disclaimed performance projections made by LaVida, including the model spreadsheet, LaVida's press releases, or LaVida's website.

29

### b. Estimated initial investment representation

Second, 16 C.F.R. § 436.5(g) requires a franchise seller to disclose "the franchisee's estimated initial investment." Plaintiff argues that Defendants violated 16 C.F.R. § 436.5(g) by misstating the initial investment amount required to start a new franchise. Pl.'s Proposed Findings of Fact, ECF No. 83, PageID.1935. Item 7 of the FDD discloses an anticipated initial investment between $160,250 to $290,000. *Id.* at PageID.1905-06. Plaintiff spent $479,000. *Id.* at PageID.1936. Plaintiff contends that Defendants' estimates were inaccurate.

The FTC requires only that franchisors have a "reasonable basis" for providing specific figures in Item 7 of the FDD. 16 C.F.R. § 436.9(c). In the evidence before the Court, Plaintiff failed to prove that Defendants did not have a reasonable basis for providing the startup costs listed in the FDD. At trial, it was established that LaVida based its figures on the initial startup costs for three Michigan locations, but primarily on the location in Commerce, Michigan that opened in 2010. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1455-57. Moreover, at trial, the Court heard evidence that Plaintiff overspent his construction budget by $60,000 and he improperly included $100,000 of his own salary in the initial investment calculation. Test. of Keith Kanouse, Tr. 1/29/20, ECF No. 74, PageID.1668. Properly calculated, Plaintiff's

30

actual initial investment was approximately $300,000—within $10,000 of the range provided by LaVida on the FDD. *Id.* Therefore, the Court finds no violation of 16 C.F.R. § 436.5(g).

### c. Representations regarding number of existing and closed outlets

Third, 16 C.F.R. § 436.5(t) requires a franchise seller to disclose "the total number of franchised and company-owned outlets for each of the franchisor's last three fiscal years" in Item 20 of the FDD. Additionally, 16 C.F.R. § 436.7(b) instructs franchise sellers to make quarterly updates to the FDD "to reflect any material change to the disclosures included." Plaintiff argues that Defendants violated 16 C.F.R. § 436.5(t) and § 436.7(b) by including inaccurate or incomplete information regarding existing and closed franchises in the FDD. *Id.* at PageID.1937.

At trial, Plaintiff proved that the FDD contained several inaccuracies at the time it was issued in July 2014. Not only did LaVida fail to update the FDD with relevant information from 2014, it was not completely accurate with regard to information LaVida had at the end of 2013. First, the 2014 FDD represented that there were a total of fifty-four LaVida franchised centers in operation throughout the United States, with two locations then open in Florida and two more projected to open as of the end of the time period upon which the 2014 data was based (i.e. as of

31

December 31, 2013). Pl.'s Tr. Ex. 25 at 23–31, ECF No. 64-1, PageID.796. At the time the FDD was created, however, and by the time MTR received the FDD in October, there were only forty-eight locations open. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1415-21. The 2014 FDD did not indicate that five locations (Royal Palm, FL (April 2014); Oak Park, MI (March 2014); Foxcroft, NC (January 2014); Mandeville, LA (February 2014); and Excelsior, MN (March 2014)) had closed by the time the FDD was finalized in July 2014 and later furnished to MTR in October. Pl.'s Tr. Ex. 25 at 23–31, ECF No. 64-1, PageID.796. Second, the 2014 FDD does not reflect the closing of the Thousand Oaks, CA location, which occurred in 2012. Test. of Peggy Davis, Tr. 1/28/20, ECF No. 73, PageID.1414-15. Third, the 2014 FDD indicated that there was only one franchise closure in 2013 when there were actually two closures. *Id.* at PageID.1439.

Regarding the first set of errors, Defendants' testimony at trial was that there was no obligation to update the FDD with any information from 2014. Specifically, it was established at trial that Plaintiff is only required by FTC rules to fully update the FDD once a year, which Plaintiff did. 16 C.F.R. § 436.7(a). However, it was also established that franchisors must "within a reasonable time after the close of each quarter of the fiscal year, prepare revisions to be attached to the disclosure document to reflect any material

change to the disclosures included." 16 C.F.R. § 436.7(b). Once such a revised document is made, potential franchisees should receive an FDD that reflects any revisions as of the "most recent period available at the time of disclosure." *Id.* Mr. Kanouse's testimony confirmed that franchisors must make a quarterly supplement if there has been any "material change in the information" in the FDD. Tr. 1/29/20, ECF No. 74, PageID.1673-74.

Information on the number of franchise units open and closed at any given time is a material fact about the franchise opportunity. *See, e.g., Cluck-U Chicken, Inc. v. Cluck-U Corp.,* 358 F. Supp. 3d 1295, 1313 (M.D. Fla. 2017) (finding an actionable FDUTPA claim when franchisor failed to provide franchisee with updated disclosure document showing closures from that year). When questioned by the Court, even Ms. Davis confirmed that whether franchise closures had occurred is something that "a reasonable person would probably want to know" before buying a franchise. Tr. 1/29/20, ECF No. 74, PageID.9-10. Defendant was thus required to update the FDD in March, June, and September with the first, second, and third quarter 2014 closures and any other material changes, and subsequently provide MTR with that updated copy of the 2014 FDD. The Plaintiff has shown that Defendants committed a deceptive or unfair trade practice by not doing so.

Next, Plaintiff must prove that these FDD inaccuracies caused MTR's damages. See *Siever*, 669 F. Supp. 2d at 1292. Esquivia admitted at trial that he did not seek to contact any open or failed franchises listed in the 2014 FDD before signing the Franchise Agreement. Tr. 1/27/20, ECF No. 72, PageID.1270. However, he did testify to reviewing the 2014 FDD. Test. of Joaquin Esquivia, Tr. 1/27/20, ECF No. 72, PageID.1240. He noted that there was "no indication" from any of the documents provided to him by LaVida that there were some franchise locations that were unsuccessful, and that he believed that all LaVida locations "were actually successful." *Id.* at PageId.1243-44. He was not told about any Florida locations that were not successful, though there was at least one that had closed before he received the 2014 FDD. *Id.* He noted that one of his reasons for choosing to invest in LaVida specifically was the documentation he was provided with, including the 2014 FDD, indicating "a proven business model" that was "successful" and "growing." *Id.* at PageID.1309. Consequently, Plaintiff has shown that Defendants' representations about the success of their business, specifically their representations about the number of franchises open and in business, were a causal factor in Plaintiff's decision to sign the Franchise Agreement and invest in the Kendall franchise.

34

Plaintiff does not have to prove actual reliance, but rather that LaVida's actions would have been likely to deceive a reasonable consumer under the same circumstances. If, in October 2014, Plaintiff had been properly provided both the 2014 FDD and quarterly updates through the third quarter of 2014, it would have shown forty-eight open locations, a change from the fifty-four figure in Table 1. Pl.'s Tr. Ex. 25 at 23, ECF No. 64-1, PageID.796. It also would have shown that five locations had already closed in 2014, including one in Florida, Plaintiff's target market. This would have contrasted with zero closings in 2011, one in 2012, and one in 2013. *Id.* at 31. It is reasonable to conclude that a potential franchisee in Plaintiff's circumstances would have had a different reaction to the FDD if they had seen that LaVida had experienced five closures in 2014, and that one of those closures had occurred in Florida. At the very least, they might have engaged in a more thorough inquiry prior to signing the Franchise Agreement. This evidence of causation therefore satisfies the second element of the claim.

However, Plaintiff did not establish at trial that the losses from that point forward were caused by the omissions of the Defendants, rather than by Plaintiff's own mismanagement of the franchise. Defendants provided extensive testimony that Plaintiff's franchise was in the bottom 10% of LaVida franchises in customer satisfaction, received poor online reviews, suffered from high rates

of staff turnover, overspent on its construction budget, and failed to effectively advertise—even after Defendants provided advertising suggestions, which in some cases were not implemented. Test. of Joaquin Esquivia, Tr. 1/28/20, ECF No. 73, PageID.1364-65; Test. of Benjamin Pryor, Tr. 1/29/20, ECF No. 74, PageID.1687; Test. of Mark Davis, Tr. 1/30/20, ECF No. 75, PageID.1735. Such mismanagement severed the causal chain between any misstatements made by Defendants on the FDD and losses suffered by Plaintiff once they began preparing and operating the franchise.

The FDUTPA provides for an injured party to receive actual damages. Fla. Stat. § 501.211(2). Normally, Florida courts look for a diminution in value or a "gap in value between what was promised and what was delivered" to measure actual damages under the FDUTPA. *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1310 (S.D. Fla. 2018). This standard is more easily applied to a physical product or service than to a franchise agreement. However, given the nature of the facts of this case, the measure of damages can be more straightforward: we can look to the expenditures that Plaintiff made at any given point in time in furtherance of the business venture. Here, Plaintiff does not allege any financial expenditures prior to the signing of the Franchise Agreement other than the franchise fee. The Court has determined that any damages after the

36

signing of the Franchise Agreement are not actionable because of Plaintiff's failure to show causation. Therefore, Plaintiff's actual damages are best represented by the franchise fee, $39,000.

## IV.   Claim Four: Violations of the Florida Franchise Act

> Per the Florida Franchise Act ("FFA"), franchisors may not: 1. Intentionally . . . . misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship; 2. Intentionally . . . . misrepresent, by failure to disclose or otherwise, the known required total investment for such franchise or distributorship; or 3. Intentionally . . . . misrepresent or fail to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect the market or market area for the particular franchise or distributorship to sustain.

Fla. Stat. § 817.416(2)(a)1-3. A franchisee must show detrimental reliance in order to establish a claim under the FFA. *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (unpublished). If a franchisee is able to prove a violation, the statute provides that the franchisee may recover "all moneys invested in such franchise or distributorship" as well as costs and attorney's fees. Fla. Stat. § 817.416(3).

Here, as previously discussed, Plaintiff failed to establish that Defendants' initial investment estimates were inaccurate, and the Franchise Agreement contained an integration clause and detailed disclaimer of any financial performance projections made before the signing of the agreement. Pl.'s Ex. A, ECF No. 1-1, PageID.61.

Plaintiff signed without indicating he was relying on any projections made by Defendants. *Id.* Plaintiff was explicitly told by Defendants they could not guarantee his franchise would be successful. Defs.' Ex. 33, ECF No. 62-1, PageID.785. Plaintiff was also advised to perform an independent assessment of the franchise's prospects for success and relied on Cordoba to do so. Cordoba Dep. 79:18-94:19, ECF No. 65-1, PageID.832-36. Cordoba performed his own investigation of the franchise's prospects. *Id.* Cordoba attended "Discovery Day" at LaVida's headquarters in Commerce, Michigan, in December of 2014, and was given contact information for other LaVida franchisees so that he could contact them himself (he did not). *Id.* at 123:16-18, PageID.843. Viewing all the facts surrounding Plaintiff's decision to sign the Franchise Agreement, the Court finds that Plaintiff has failed to establish that he detrimentally relied on any specific performance projections. *See Cold Stone Creamery,* 332 F. App'x at 567 (finding plaintiff failed to establish detrimental reliance when "franchise agreement included a detailed disclaimer and explanation regarding the risks of owning and operating a franchise and encouraged franchisees to conduct an independent investigation of their prospects for success"); *Beaver v. Inkmart, LLC*, No. 12-60028, 2012 WL 3822264, at *6 (S.D. Fla. 2012) ("Plaintiffs cannot satisfy the detrimental reliance requirement, as the Franchise Agreement

contained a detailed disclaimer . . . and even required Plaintiff to set forth in writing any representations that previously had been made regarding the prospects or chances of success of the Inkmart franchise.").

## CONCLUSION

The evidence presented shows by a preponderance that Defendant's failure to provide an accurate, updated Franchise Disclosure Document as required by 16 C.F.R. § 436.5(t) and 436.7(b) violated the FDUTPA. Consequently, the Court awards damages in the amount of the franchise fee, $39,000.

As to Plaintiff's claims of fraud, fraudulent inducement, misrepresentation, negligent misrepresentation, and violations under the Florida Franchise Act, Defendants are entitled to judgment on all of these remaining claims. Parties who wish to file requests for attorney's fees have 14 days to do so. Fed. R. Civ. P. 54(d)(2)(B)(i).

Let judgment be entered in accordance with these findings of fact and conclusions of law.

**IT IS SO ORDERED.**

Dated: November 6, 2020   s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE